Next case is 4-0-9-0-5-0-4, Scott v. Pneumo Abex, Corp. For the appellant, James Wilder. For the appellees, Raymond, help me. Modisitt. Modisitt and Colleen Bain. Have you split your time? Mr. Wilder. Good morning, I'm Jim Wilder from the firm Wilder, Corbin, Kelly and Bloomington. And I represent the Scott family. I'm asking the court to find a reversible error occurred in regard to certain evidence that sends this case back for a new trial. We raised a single issue in our briefs and on appeal, and that is that concerns a questioning that was done first by the defense in regard to some tissue, or alleged tissue, and then objections that were sustained when I attempted a redirect with our expert to go into that issue. And I guess a little background, this case was a lung cancer case. Mr. Scott, we allege, was exposed to asbestos. He had smoked cigarettes, and our testimony was that both the cigarettes and his exposure to asbestos were implicated as causes of his lung cancer. We presented testimony. We initially disclosed our treating doctors, Dr. Eagleton from here in Springfield, as well as doctors in Jacksonville, that gave those opinions, and in fact, we called Dr. Eagleton at trial. He said that his opinion was both cigarettes and asbestos that contributed to cause Bob's lung cancer. The defense, shortly before trial, the trial was initially set for May of 2007, and it was delayed for a period of time because the firm I was previously with split up and the file would not be turned over. Eventually it got turned over after some orders were entered. And the month before the May 7 trial setting, defendant Honeywell said it wanted to disclose an additional expert, and one of that expert, Dr. Michael Graham of St. Louis, to review pathology, the slides that had been taken in connection with procedures that Bob had done. And I guess to back up a little bit, I know the panel, some of the panel has more familiarity probably with asbestos cases than others. I think Justice Steigman goes back 20 years now. In asbestos lung cancer cases, where somebody says, I got lung cancer, I was exposed to asbestos, on the plaintiff's side, the testimony is usually that if you can show you're exposed to asbestos, then asbestos is a cause, even if you smoke cigarettes, because there's an increased synergism between those two factors. On the defense side, the defense often says, well, unless you also have asbestosis, which is scarring within the lung, it's not cancer, it's a separate disease, unless you also have that, you can't implicate the asbestos as a cause of the lung cancer, instead it's all cigarettes. So there's a basic disagreement on that. There's a spin off of that even to where there is in the literature that if you don't have, if it doesn't show up, asbestosis can show up on chest x-ray and CT scan if it's bad enough. It didn't show up on Bob's. And we never said Bob had asbestosis. The plaintiff never said that. We said he was exposed to asbestos, and he smoked cigarettes, and both are implicated. If asbestosis is bad enough, it'll show up on chest x-ray and CT scan. But even if it doesn't show up there, sometimes you can find it in the slides. If you have lung tissue, you can microscopically look at it and see the fibrosis there. There's a final one off of that, which is even if it doesn't show up there, if you have the right lung tissue, you can take some of that tissue and digest it. Sort of like Clorox bleach on it will destroy the tissue, it'll leave the mineral fibers. Then you count the number of fibers you have compared to the general public and see if there's an elevated lung burden, it's called. And if so, that in some doctors' opinions would implicate asbestos. That's sort of the spectrum of where they're at. Plaintiff filed the case and presented the treating doctors that said he was exposed to both cigarettes and asbestos, both are implicated as a cause. A month before the May 7 trial setting, Honeywell says they want Dr. Graham, a retained expert, and the time for disclosure by defendants had been months before, to look at the slides. And plaintiff agreed Dr. Graham could look at the slides as long as it wouldn't delay the May trial. And so Honeywell got an order and went out and got the slides from the 1997 procedure. Bob had two procedures, 1997 and 2002, and then he died. This was a death case. They got the slides from the 1997 procedure, sent them to Dr. Graham, and he said he didn't see fibrosis and therefore asbestos was not a cause. And the May trial got continued at Honeywell's request. They eventually disclosed Dr. Graham's report in June of 2007. We moved the bar of that and that was denied. And the case was reset for trial eventually from March of 2008. And so plaintiff got the same slides that Dr. Graham had looked at, sent them off to a retained expert, Dr. Samuel Hammer, and then asked leave to have Hammer come in as a rebuttal witness saying I've looked at the same materials Graham looked at and I disagree. I still say asbestos was a cause. And that's basically where we were at as we approached trial. We called Dr. Eagleton, then I called Dr. Hammer. Dr. Hammer gave his opinion that asbestos was also a cause. Bob didn't have asbestosis. And before he took the stand that morning, it was reiterated he was a rebuttal witness. He was appearing before Dr. Graham chronologically, but he was only in for rebuttal and the opinions were limited to that issue. Opinions, general opinions on whether asbestos break lines cause disease, things like that I couldn't go into with Dr. Hammer because he was in for rebuttal. On cross-examination, and I'm almost there, I know it sounds like a lot of lead up, but on cross-examination, defendant Avex started questioning Dr. Hammer about tissue digestion because Dr. Hammer's lab can do tissue digestion. It's one of the few places in the country that can. Questioning him about tissue digestion and had he seen the saved lung from 2002 and had he had the reports from 2002 and so on. I did not object. And when I get done and is there a chance they're going to say, well, Jim Wilder didn't object, so what's he complaining about? The gist of the questioning by Avex's counsel, Mr. Modisette, and the impact was pretty clear was it was a suggestion that we had chosen, plaintiff had chosen not to do something, plaintiff was hiding some lung somewhere from their own expert. Well, what is your objective? You thought that was what was going on? Because I thought if it was a sustained judge, it would only heighten the idea that I was trying to prevent the jury. And I plan to go into it on redirect. Maybe I made it wrong. I'm sorry. I was a trial judge for a long time. And it seemed to me that the idea that a judge can't deal with allegedly improper questioning, you just have to sit there, is something that in my experience and records I've read, I just don't think is true. I think that court can provide all kinds of remedies depending on what you ask. If this was truly as terrible a question as you suggest, Mr. Wilder, court's got to sustain the objection and instruct the jury, disregard and explain why. I used to do that frequently. If this was an improper question, it implies something that's not true. You should disregard it, folks. Don't go back in the jury room and think about it at all. Words to that effect. But the other thing is, it seems to me the whole, the big to do here is about tissue digestion. And from the record, weren't you the one who first raised that topic in your direct examination of Dr. Hammer? I think actually the first reason was probably ABEX's opening statement. Then with Dr. Hammer, I asked him. Well, opening statements are opening statements. During the questioning of Dr. Hammer, didn't you raise the topic in the direct examination? I raised the topic of tissue digestion, something his lab did. Why did you do that? Because it goes to his credentials and qualifications, and it had already come up in terms of about tissue digestion. In opening statement, that was it? Right. Well, it seems to me that this would be a questionable situation for you if you had not touched it at all. They had raised it, and then you failed to object. But when you bring up the subject of tissue digestion and cross-examination, why is it improper or beyond the scope for them to say, tell us more about tissue digestion, as Mr. Wilder asked? Nothing wrong with that question. If that was all they asked, I wouldn't be here, because all I did was bring up tissue digestion generally, and then the question that what you got were some slides here, and that's not the type of thing that you would do tissue digestion on. They say, Dr. Hammer says, well, in response, well, you could. Well, actually, if you read the full answer, he says this isn't the type of tissue that would give an accurate, you know, what tissue digestion is. It wouldn't give an accurate count. You can digest anything, but you wouldn't digest this type of emphysematous tissue. So I brought it up to say generally it can be done, but it wouldn't be done on what you got. And the questions asked by the defense judge were not, the general, tell us more about tissue digestion. The questions were, well, you didn't get the saved lung from 2002. You didn't do tissue digestion, and so on. And I did not object. I made a judgment. I made a lot of wrongs in my career, but maybe this was one. But I thought the better way was on redirect to point out, which I planned to do and the objections were sustained, that this whole issue of tissue comes up with Honeywell. So why didn't the trial court allow you to clarify that on redirect? When I first tried, ABEX objected saying pre-trial procedures are never, you know, this is improper. Pre-trial procedures aren't part of the case. And I tried to get around that as best I could, and I said I want to bring out the tissue digestion, the whole pathology comes up as a result of their efforts. And the ABEX statement then was that it would be unfair to allow me to go into that because they tried, this is the June 2 proceedings, said that they had tried to do a tissue digestion, which we would have done a tissue digestion. It was denied. It's unfair for now the plaintiff to suggest there's something we could have done as a response to this because we tried, we tried, and the order and the motion was not granted. And the court said, the court sustained the objection. And that proved incorrect in the following day, right? That was incorrect. And the court, well, and the court did not allow me to go into that. It said the most I could do was show that Dr. Graham and Dr. Hammer got the same materials, and I couldn't get into the chronology that Dr. Graham was listed late. They decided what to send him. Nobody asked for tissue digestion. We asked leave to put in Dr. Hammer's rebuttal just as to Dr. Graham, so we sent the identical materials. And then at the time of trial, they go into, well, you didn't, Dr. Hammer, you didn't get the saved right lung. You didn't get this. You didn't get that. And I sat by and didn't say a word because I planned on redirect to show, well, how we went down this path. And the court sustained objections to me being allowed to do that, in part, I think, based on the representation that, you know,  And it turned out that wasn't the case. Is the court's ruling with regard to your redirect examination sustaining the defense objections and issue on appeal here? Yes, Judge. Well? I'm sorry. I didn't mean to. I'm looking at your arguments, and it's one argument. Okay. Defendant's representations regarding the existence of pathology deprived plaintiff of a fair trial. Right. Where is the issue? Where did you raise the issue about the trial court here in denying your redirect examination? I think it's on page four of your reply to the brief, counsel. Right. I thought we raised that. Did you raise it? You have just the one argument in your initial brief. Page 17, I'm just flipping quick of our initial brief. The paragraph, defendant's distortions continued during the redirect of Dr. Hammer when the court sustained an objection. When the plaintiff attempted to paraphrase the next sentence, attempted to address defendant's tissue digestion questions, the defense objected. During sidebar, counsel represented what I just read would have done, so it's in our initial brief. Maybe a technical point, but do you raise as an issue on appeal that we should reverse because the trial court erred in denying your redirect examination? I believe we do in the initial brief, and I think that's part of the subject of the initial brief. Well, the defense didn't raise forfeiture until they did their initial briefs, right? Forfeiture? Waiver of the favor to object. Okay. Yeah, well, they only have one brief, so of course it's in their initial brief. Right, and so then you replied to that. Right, saying that I didn't waive. I think Honeywell, at one point in this brief, says that somehow I even waived those objections being sustained because I did not object or move to strike the objections that were sustained, which I don't understand. But other than that, I don't think the fact those objections were allowed has been waived or sustained, I guess. I don't think that's been waived. It is part of our subject matter in our initial brief. It seems to me defendants actually argued that you should have objected, and by failing to object, you forfeited the issue. But if you had objected, your objection would have been overruled anyway because their question is proper. Am I agreeing? Is that what their briefs indicate? I think that's a fair reading, because I think ABEX, I didn't pick just on ABEX, but they had to leave the comments, although Honeywell joined in a trial, but I believe ABEX's brief could be characterized as, number one, it wasn't error, anything they did. Number two, if it was error, it was harmless error. And number three, if it's error, then plaintiff didn't prove other portions of the case, which they don't even cite to the record on, and I went back in our reply brief and addressed that brief. But Honeywell didn't make that argument. Did you raise the same issue in the post-trial motion? I believe so, yes. I'll be honest. I didn't do the post-trial hearing. My partner, Ms. Corwin, did. Nobody suggested, I'm sorry. Well, the reason I ask is because it's in your post-trial motion, but this is a matter where, in fact, you're arguing that this was so terribly affected to the jury, and it was bad and all that. Again, as a trial judge, I think the court actually heard all this and saw it. It's a better position to judge. The trial court denied your motion. It did. We don't have any explanation, because you didn't provide us with the hearing of the motion, the post-trial motion, to hear what the trial court said about why the court thought your post-trial motion should be denied. That's true. There is no transcript of the hearing. The court indicated during the trial it thought it was effective also, and I quoted from that about what he thought the impact was, not only on himself, but on the jury. The post-trial motion, the opposition by, and we referenced this in our briefs, the opposition by ABEX, said that to the extent there was anything about this evidence and Hammer not seen, it was similar to the mystery guy in Nolan v. Wild McLean, the 2-1 decision. And then, of course, since then, the Supreme Court changed Nolan v. Wild McLean and said part of the reversible error was that mystery guy argued. Now, they would say, well, that's a little different, though, because Wild McLean objected to the mystery guy argument, I believe, in the Nolan decisions, and I didn't object to the initial questions. My judgment was I thought, frankly, I was going to come out ahead on redirect if I could show the chronology, which is they brought it up. They brought up the pathology. Hammer was limited to what they sent to their expert. And they never asked for tissue digestion. And that's when we ended up at the bench and they said, yes, we did, and then it turned out the next day, well, no, we didn't. Did you provide an offer of proof as to what these witnesses would have said had the objection on redirect not been sustained? I did an offer of proof where I tried to put in the inventory and show the chronology. I believe that would have been Plaintiffs' Exhibit 163, which was refused, which was the inventory of what Dr. Graham received from Honeywell. Does the record show the trial court understood this was an offer of proof? I believe so. I was there, and I'll be honest, Judge, I believe it did, but I didn't read that part of the transcript for today. Because normally, Counsel, if an objection has been made to the testimony of a witness and sustained, to perfect the record on appeal, we need an offer of proof showing What would they have said? Do we have that here? I know we have an offer of proof of what I would have asked. I don't know if we have an offer of proof of further examination of Dr. Hammer, if that's what you're saying. Well, that's... I understand. I attempted to put in, because, again, a lot of it was the chronology, probably unknown to Dr. Hammer or even Dr. Graham. Did you ask to make a formal offer of proof? I mean, he's out of the stand. You could have, before excusing him, as a judge, out of the presence of the jury, want to make an offer of proof. I just want to ask these guys the questions to which you sustained an objection earlier. I made an offer of proof, but I don't have a recollection, as I stand here today, of asking Dr. Hammer questions. I don't have recollection one way or the other, but if I had to bet, I don't think I did. It's a single issue, and, again, I think it did have impact. The case was hotly contested on the other grounds, and, again, that's the only issue we're raising, the other grounds for what it's worth. As to Honeywell, who doesn't even argue, plaintiff didn't prove other things. The evidence is the same as in Dukes, which means Honeywell, if we won, would have got a new trial, because we put in some of the material for the Dukes case that Justice Turner wrote the decision on. And the evidence is the same. Plus, in regards to conspiracy, to what was put in in Dukes concerning ABEX, ABEX wasn't in Dukes, but we put in evidence, as well as in the two Burgess decisions. So, and that's a two-page comment by ABEX at the end of their brief on that, saying, well, the issue, the only issue we're raising is concerns of pathology. We believe it was prejudicial. The trial court at the time thought it was prejudicial. But going back there, you know, the trial court at the time thought it was prejudicial. Well, there was just some music. So when it was really before the trial court to rule, that was at the hearing in the post-trial motion. Obviously, whatever the musings were earlier, the trial court overcame them in the cool light of day. But we don't know what happened. Why shouldn't we assume, that far I know, at the hearing in the post-trial motion, has it been, well, Mr. Wilder, yes, I understand that, but in retrospect, I don't think it was that big a deal, your motions did not. Wouldn't that be helpful for us? It would be helpful. The only thing I would say is, on what Your Honor just said, and I know my time is up, is, I don't think Judge Mistral was caught up in the heat or anything. I think he was cool throughout. He's a good trial judge, and I think it was more than musings. I think he saw the impact of the testimony and his statements were more than musings at the time. That would be all I'd say. He's a good judge. Thank you. Go ahead, Your Honor. Good morning, Your Honor. Good morning. My name's Ray Modisitt. I was the lead trial counsel from way back as long as Mr. Scott. I'd like to jump, if I might, right to the end of the last discussion. I have 12 minutes, and that's not a long time for a follow-up, so I'll speak as efficiently as possible. During the course of trial, the question came up, and the musings had to do about the tissue specimen, versus tissue specimen. The post-trial motion of Ms. Corwin accused me of bad conduct by making up the fact that there was never any tissue saved. The whole post-trial motion accused me of attorney misconduct for making up evidence and suggesting it to the jury. It was not until our post-trial motion that Judge Mitchell realized that there was, in fact, the surgical pathology report that accompanied Plaintiff Exhibit 129B, which was put in evidence through Dr. Eagleton. How do we know that? It's in the record. What record? It's attached to the Defendant's Able Pneumoindex post-trial motion as Exhibit A. We don't have a hearing on this, though. It was just your motion. The motion that was then heard by Judge Mitchell, of which he noted specifically at the hearing that there was this attachment, and it does in fact say... We don't know what he noted at the hearing, do we? I was there. I'm sorry. No, we do not have a record. We don't have a record? No, we do not. We do have in the record that the surgical pathology report for which we were accused was non-existent is in fact existent, was provided to us by... It was attached to your response to the post-trial motion? Attached to my response and was provided by Plaintiff's Counsel during the discovery of the case. And that's what the court denied? No, the court didn't deny it. The court denied the post-trial motion? The court denied the plaintiff's post-trial motion, yes. Okay. So, just on that issue alone. But going to another issue, the perception seems to be from the plaintiff's standpoint that they were precluded from doing something. Let's set this whole thing in context. Dr. Hammer has published extensively on asbestos disease and various causations. I have been doing this for over 30 years as has Mr. Wilder. We both know who these experts are. I know and had known that Dr. Hammer wrote in his textbooks as far back as 88, testified before the Northern District of California establishing medical criteria for the Western MacArthur bankruptcy on October 10 of 2003. I had that transcript. That transcript directly contradicted what he came to that courtroom to tell the jury. In that transcript he says if you don't have asbestosis clinically or pathologically, you must have tissue digestion to support an opinion that yes, it's an asbestos related lung cancer. So he comes to the courtroom, didn't have clinical asbestosis, didn't have asbestosis by histology, no tissue digestion. Therefore one would assume under his own sworn testimony given in the criteria phase of the Western MacArthur bankruptcy criteria that he would say this is not a lung cancer related to asbestos. But he didn't. He didn't say that. He said differently from that. So the purpose of talking about tissue and tissue digestion, first of all, was not brought up first by me. It was brought up by Mr. Wilder in the transcript at page 14. I'm sorry, page 13. Well Mr. Wilder made reference to your supposedly discussing it in opening statements. He's in error. I challenge that. It's not there. Okay. It's not there. Go ahead. Counsel, your position is that if Mr. Wilder had objected to your question it would have been overruled by the trial court. I think it would have been overruled by the trial court. He injected the entire digestion purpose into the direct examination of Dr. Hammer in which Dr. Hammer says the reason you do it was to assist in whether the asbestos related disease like lung cancer is caused by asbestos. That's his own expert of why you do these studies. That was done before I had anything to do with Dr. Hammer. So by going into the tissue, the digestion that he didn't do was to show that this was not in accord with his established personal criteria that he wrote his book and that he expressed an opinion to the federal court in California. It was impeachment. It was impeaching of his testimony at this time and it was extremely relevant. We had a doctor, Dr. Michael Graham from St. Louis who we knew were coming who would say you have to have asbestosis to have a lung related asbestos lung cancer. And he says he doesn't have asbestosis so it's not related. Dr. Hammer all of a sudden took a different tactic even though he previously would have said something completely different. Here's where I find trouble, Counselor. The trial court statement. I'll just read it. Sure. That line of questioning certainly put into my mind is there some tissue somewhere we don't know about and I'm sure it did that to the jury too. I understand that. I understand what he said because at that point in time Judge Mitchell did not know that the pathology report of November 21 of 2002 reflected that the tissue was saved. He didn't know that at that time. So the tissue was available then. Is that what you're arguing? I don't know. The report certainly reflected that it was saved and Dr. Hammer testified in response to a question but it was not a responsive answer that it probably was available. He also said in response to Mr. Wilder that he could do digestion on what Mr. Wilder had sent to him. But the point of the... When Mr. Wilder does his rebuttal and I ask him if the tissue was available is his response going to be that he doesn't know? He did ask him about the tissue in perpetuity. He asked him about... Mr. Wilder was not precluded from asking Dr. Hammer questions. I saw the question about perpetuity but it doesn't answer what I'm asking today. Was it available? I don't know. As I stand here today, I don't know. All I know is what the report showed that accompanied the op report that the plaintiff put in evidence. You mean it was available in 2002? Is that what you're saying? Well, we know it would have been available when it was done. Typically, as Dr. Hammer noted, blocks would be made and he indicated the blocks probably were still available thereafter. How long thereafter? Nobody knows. Nobody said. But the jury was apprised of that and the jury was apprised according to what the court had authorized that Mr. Wilder brought out that Dr. Graham looked at the same thing Dr. Hammer did. He wanted to go into that. This alleged offer to prove just showed the tissue slides that were authorized. Well, that all went before the jury without the order of the court. There's nothing the plaintiff did that would suggest that they didn't get to do something that ordinarily you could do in a courtroom. He got to ask Hammer, do you know, twice he asked the question. For example, he asked him, were you aware under Illinois law anybody can ask for tissue to be produced? Answer, I didn't know that. That was the first, you know, before any objections began. Then he said, then he asked another question. We had an objection. We had a discussion. And then pretty soon we go back and the courts haven't even resumed. Jim says, now back to this, if there's a right loan saved. Plaintiff's question, were you aware that under Illinois law any party, if they timely request it, can have the materials produced and will do whatever test? I objected. And the court says, I'm sure that you're going to point that out. But I think he said, either party, if they make a timely request of it, so you can answer that question. And before the jury, the witness says, I don't know. So, what more could he have done? And those are the only two questions to which you objected? Yeah. And the one answer is, I don't know. And both, I don't know. So, I guess that accounts for why we don't have an offer of proof. But there was nothing further. There was no motion respecting this. There was no motion for mistrial. There was no motion for clarifying instruction. There was no motion of any kind. And throughout my entire cross-examination, it was not a single objection by Mr. Walker. Mr. Wilder, with regard to this area. We believe that under the law of Illinois, at minimal, that's a waiver of any claim to error. In addition to which, if you look at, and I'm not sure, where is it? Just the white. Oh, I'm sorry. When it goes yellow. Oh, okay. I'm from Indiana. We do it differently. But the other element that I believe makes it an easy appeal is that there are many elements to this appeal and this trial. This was a four-week trial. It all really had to do with conspiracy, which we vigorously denied the existence of conspiracy or the inclusion of any conspiracy. The First Circuit has recently indicated that if, in fact, the jury award under a general verdict can be upheld on any of the defense theories, then it's presumed that it will be upheld. And there's no question but what that we had defenses and vigorous defenses to the issues of conspiracy, whether ABEX was in a conspiracy, whether there was a conspiracy in the first place. There's all kinds of bases for that to be defined. But just going back to this tissue area question, it defies imagination how the plaintiff is the one who approached this whole area in his examination. We followed up on the subject matters brought forth in the rec. We think that this court should sustain Judge Mitchell's ruling in denying the post-trial motion and denying this appeal. We think the court was the one who watched this and had control of it. And I believe that if Judge Mitchell felt that wrong had been committed, he would have created that post-trial motion and he did not. We think that this court ought to sustain it. Thank you. Thank you, counsel. Good morning, judges. I'm Colleen Boehm. I'm from Victor-Midwell & Emory in Chicago. I represent Defendant Honeywell or Kelly Honeywell in these matters. I think that both counsel for plaintiff and counsel for ABEX have covered the issues   and counsel for ABEX have covered the issues that were raised in this single-issue appeal. Quite adequately. And I want to reiterate what Mr. Modisette said at the end, which is that whatever musings the trial court made about missing pathology or what the jury might be thinking, the objections were of the defense to the questions on redirect regarding pretrial procedure  The judge never went back and rethought those rulings, never went back and thought or indicated on the record that there was prejudice to the plaintiff or that the jury or himself had been misdirected or had been misrepresented about the facts. He was apprised of the events that unfolded at the pretrial matters the following day and he still did not... So you mean his musings of concern, by the time he found out, I guess, from what counsel argued, that there was a question whether tissue was available, that therefore put him in a position where he didn't think that those concerns he'd raised earlier had any merit? I think that's clear from the denial of the post-trial motion and not pursuing anything further the following morning when ABEX did make it clear to the court that while there had not been an official request for tissue digestion, that the court's ruling denying a rebuttal witness to the rebuttal witness precluded any further efforts to proceed on what sort of test would be... Well, I'll ask you like I asked before. Was the tissue available for inspection for purposes of this trial? I know it was available in 2002, but for this trial, was it available? Is your answer you don't know? Nobody knows if it was available. There was no request for that tissue digestion. The questions to Dr. Hammer were... Don't you think that's something that would have been going through a reasonable juror's mind? Was it available, and if it was, why wasn't it tested by one party or the other? That would be a reasonable inquiry for the jury to wonder about, and it was raised directly by plaintiff during his direct examination of Dr. Hammer. It's not an issue that was raised on the defense side. So the cross-examination then was intended to place in the juror's mind the question of the availability of the tissue. That was part of the reason for the questions. No, the reasoning for the questioning was the further pursuit of the tissue digestion issue, which was raised on direct by Mr. Wilder with Dr. Hammer, and was raised when he even talked about in his questions to Dr. Hammer about the tissue loss. If it wasn't available, or if it was available, I mean, as a defense lawyer, would you want the jurors to know that, hey, it was available, plaintiffs had the burden of proof, why didn't they do testing? That was the question. They heard from Dr. Hammer the importance of tissue digestion and asbestos-related litigation in determining whether a lung cancer is caused by asbestos exposure. They heard the importance of tissue digestion. So the question to Dr. Hammer is very straightforward. Was there tissue digestion in this case? And the answer is no, there was not. It was only when defendant Honeywell wanted to pursue pathology. But if it wasn't available for testing, does that give plaintiff a fair shake with the jurors, or has there been an impression left with them? The plaintiff just messed up here. They could have tested the tissue, they failed to test the tissue. Don't we need to know whether it was available before we get into that? We know from the 2002 pathology report that tissue blocks were saved. We know from the agreed order that was entered allowing Honeywell to pursue the slides that that order specifically stated, but not tissue blocks. We know that plaintiff, when questioning Dr. Hammer, specifically talked about, or the tissue blocks from 2002. So it's not just defense raising this issue. It was in the pretrial matters, it was on the direct, and it did come up in cross-examination. And the issue is, was there a tissue digestion? And that's a fair issue for the jury to consider once plaintiff has raised with their own expert the importance of tissue digestion. So it was both within the scope of the direct examination. It did not raise a false issue because there are records that the tissue block was saved. It was within the scope. Plaintiff himself has said, Mr. Wilder today has said, I thought, frankly, I was going to come out ahead. I made a judgment call. Well, a judgment call at trial or a strategy determination by trial counsel is not an excuse for not raising what you thought was a valid objection. He made a conscious decision not to object to these questions because he thought, quote, I was going to come out ahead. And the way he wanted to come out ahead on redirect was to go into pretrial procedures and the way the law works as they state in their brief. And the trial court properly said, no, you can't go there. You can ask questions about both sides having the same material to review and you can talk about the fact that Dr. Hammer reviewed the exact same thing that Dr. Graham, the defense expert, reviewed. But you cannot go into pretrial procedures. That's not appropriate. And that's the only limit that was placed on plaintiff's questioning of both on redirect Dr. Hammer and on cross-examination Dr. Graham. And the fact of the matter is the entire appeal is premised on questions that they didn't object to and a line of questioning that they argued they didn't get to pursue that they did pursue. I just want to make sure I understand this. Honeywell did pursue pretrial trying to obtain tissue blocks to do digestion studies and that was denied? No. The agreed order, though, specifically says we can obtain the tissue slides and in the order it states but not the blocks. Why is that? I wasn't the one that prepared the order. But, again, it's in the record that there were blocks and they could not be obtained as part of the agreed order. We were just to collect the slides. And Exhibit 163, which Mr. Wilder indicates would have been part of his offer of proof, is simply a listing of the slides that we were allowed to obtain from the hospital. But we were precluded specifically in the order from asking for tissue slides. But that was an agreed order. It was an agreed order. I guess my question is then why would Honeywell agree not to be able to obtain the tissue blocks? Because we were given what our expert had asked for to do the slides to review what he needed to review to determine whether or not there was asbestosis present in Mr. Scott's lungs. As opposed to a tissue digestion which determined the asbestos fiber burden within the lung. The final issue that I would raise, and I will confess it's not in Honeywell's brief, is the issue of the general verdict. I think plaintiffs completely mistake that issue by saying, well, since we didn't raise conspiracy as an issue on appeal, you can't argue to the court and raise a new issue that the general verdict can't rule here. And I think that's a misstatement of the argument. I think it's a valid argument that this was a general verdict that can be sustained on other grounds, separate and apart from medical causation issues, tissue digestion, and otherwise. And that is an equally valid basis upon which the verdict should be sustained. Thank you, counsel. We're out of time. Rebuttal, please. I was a little bit afraid, just to go from one to another. On this last point, again, the evidence is the same as in Dukes v. Honeywell, which the court denied Honeywell's judgment would be a request on. The evidence is the same plus as in Burgess v. Abex, all in regard to conspiracy. Honeywell doesn't even mention that in the brief. Abex doesn't incite to the record in it. And I just respond and say, wait a second, this is a single-issue appeal, and there's two pages at the end of the Abex brief saying, well, you didn't prove anything else either. It doesn't incite to the record. Now, going to the concerns of Justice Polk, the reason they didn't ask for the tissue blocks when they wanted Dr. Graham to do it is Graham doesn't do tissue digestion. He doesn't have a lab that will do it. Nobody ever asked for tissue digestion after Hammer was allowed in response to Graham, Hammer just to rebut Graham, Sprinkman, a defendant who settled, filed a motion saying they wanted to add another expert to look at the slides. And there was nothing in the Sprinkman motion about tissue digestion, and that was the only motion that was ever brought after Hammer, and that's the one that Abex allegedly joined in. But there was no request in there for tissue blocks or slides. Opening statement by Abex, it's volume R2, Roman numeral 2, pages 68 to 70, where Mr. Modisette tells the jury about tissue digestion and the role it can play. And we even, in our reply brief site, at page 5 of our reply brief, cite that and even quote his statement about, we don't have any information as to any tissue digestion to assist in eliminating the requirement of asbestosis. It's in his opening statement, so there's that challenge. Objections were sustained other than just the two questions. The objections were sustained when I said I wanted to go into chronology of how it was the defendants that brought up the issue of the pathology in the first place. That objection was sustained, and I was not allowed to do that, but just to show that they both had the same thing, Graham and Hammer. Dr. Hammer was asked during trial about the report, we never said the report was nonexistent, the issue is the lung, and the answer is nobody knows. Well, you have a witness who apparently, Dr. Hammer, does tissue digestion. Right. And he was asked about it first by you and then cross-examined about it. Why isn't this, to some extent, maybe where you're the plaintiff with the burden of proof, like what we're familiar with in the criminal case? The burden of proof is much greater there, but still, you're the plaintiff and have a burden. Some cop at the scene had dusted for fingerprints and sent them off, and the defense attorney asks, did he dust for fingerprints? Yes, he did. And what were the results? I don't know. It turns out that no one ever sent them in. They never were examined. No one ever testified about it. Wouldn't that be something the defense could ask about and maybe even speak about? Final argument about, you know, where are the fingerprints? What's happened here? They had access to this evidence and, you know, the state also could say, well, the defense could have done it too, but the defense has no burden of proof. I think a more correct corollary to what occurred here would be that if the cop was only allowed, by court order, not to dust for fingerprints because he was in to rebut the defense investigator who didn't dust for fingerprints, then in that situation there wasn't any dusting of fingerprints. I mean, hammer was allowed. We were allowed leave to disclose hammer only to rebut Graham. And we, with our motion showed, we'd send him what Graham had, Graham's report and Graham's slides, and that was all he was in for was to rebut Graham, and I was limited. Why did you agree to the limitation on tissue digestion that was earlier discussed? I guess I didn't. The tissue blocks are never in the first order because there's a limited amount of tissue in tissue blocks, and if there's going to be an order on tissue digestion, which is destructive testing, the court has to get how much tissue is there in the blocks, is there enough for each side to get half, and so on. They didn't want that. Graham doesn't do tissue digestion. He just looks at slides, and so they never requested it, and the tissue digestion didn't come up until, number one, an opening statement by Apex. Number two, in my exam of hammer at page 58, I asked him about, you know, what is tissue digestion. I asked him about that generally, okay, about what it is and how it's done, and then I asked him about is this the kind of tissue slides he got, is that the kind of thing you could do tissue digestion on, and he said you could do it on anything, but this wouldn't be an accurate counting. This isn't normally what you would do it on, something like this. That's where it was at the time I ended my directive hammer, and that's where it was until Apex came up with his questions about the saved lung, the line the rest of the specimen is saved, that there was a saved lung from 2002, and you didn't do tissue digestion on that, and that wasn't sent to you. No, he was a rebuttal witness to Graham who got the same exact slides that the defense chose to give to Graham, and no defendant ever asked for tissue digestion, contrary to the representation that was made up at the bench on that second. It's a single-issue appeal. My time is up. Thank you, counsel. Case is submitted.